IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America | : | |
| | : | Case No. 1:10-CR-053 |
| | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART |
| Toriano Hemphill | : | AND DENYING IN PART |
| | : | DEFENDANT'S MOTION TO |
| Defendant | : | SUPPRESS |

This matter comes before the Court on Defendant Toriano Hemphill's Motion to Suppress Evidence. (Doc. 18.) The Court held a hearing on Defendant's motion on June 16, 2010. Following the hearing, Defendant and the Government both filed supplemental briefs. (Docs. 26, 27.) For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion. The Court hereby suppresses all statements made by Hemphill in response to an unwarned custodial interrogation that occurred on February 4, 2010. The remaining evidence Hemphill seeks to suppress, particularly the gun located by his parole officer as a result of his unwarned statement, is admissible.

I.   **FACTUAL BACKGROUND**

Defendant Hemphill is charged in this action under one count of unlawful possession of a firearm. The weapon in question was discovered by an Ohio Parole Officer, Chris Gipson, who had been assigned to supervise Hemphill in connection with a previous aggravated robbery charge. (Suppression Hearing Transcript 8.) Hemphill claims that Gipson's discovery of the

firearm, along with ammunition, clothing, and financial records stemmed from an unlawful custodial interrogation, prior to which Gipson failed to advise Hemphill of his *Miranda* rights. Accordingly, Hemphill moves for the suppression of all statements made after he was placed into custody and all evidence recovered as a result of the interrogation.

The incident leading to the discovery of the firearm took place on February 4, 2010. (*Id*. at 8-9.) On that morning, Gipson made an unscheduled visit to Hemphill's residence to question him about an alleged parole violation. (*Id*.) When Gipson arrived at the address Hemphill had listed as his residence, 205 Long Street in Hamilton, Ohio, the apartment appeared vacant. (*Id*.) After knocking on the door and receiving no answer, Gipson peered through the windows. (*Id*. at 9.) Though no lights were on, Gipson was able to see some pills on a table. Gipson could not determine if the pills were an illegal substance. (*Id*.) Gipson testified that in such situations, when parole officers see something that they are "unsure of," policy dictates that they contact the police department. (*Id*.) Accordingly, Gipson called the Hamilton Police Department. (*Id*.)

While waiting for the police to arrive, Gipson saw Defendant exit a residence located across the street at the corner of Long and Wallace. (*Id.* at 10.) Gipson approached Hemphill and questioned him about his whereabouts and the alleged parole violations. (*Id.* at 11-12.) While Gipson and Hemphill were talking, several Hamilton Police Officers arrived. (*Id*. at 13.) Some of the officers were wearing ski masks in order to protect their identities. (*Id*. at 26.) Shortly thereafter, Hemphill opened the door to 205 Long Street and let the officers into the apartment. (*Id*. at 13.) The residence appeared to Gipson to have been ransacked: It was cold and dark, there was no electricity, and miscellaneous items were strewn about the floor. (*Id*. at 14.) After entering the apartment, Gipson handcuffed Hemphill and questioned him about the

pills. (*Id*. at 13.) At the suppression hearing, Gipson testified that he handcuffed Hemphill because it is a practice of parole officers to detain a parolee while he is being questioned about violations and because Gipson thought the pills, which were ultimately discovered to be blood pressure medication, might be narcotics. (*Id*. at 14-15.) None of the Hamilton Police Officers participated in questioning Hemphill or in any search of the residence. (*Id*. at 14.) Gipson did not advise Hemphill of his *Miranda* rights. (*Id.* at 33.) During the questioning, Hemphill admitted that he actually did not live at the Long Street apartment, and was staying at an apartment across the street at 1251 Wallace Street. (*Id.* at 15.) Hemphill also admitted that there was a small amount of marijuana at the Wallace Street apartment. (*Id*.)

Following those admissions, Gipson took Hemphill across the street to retrieve the marijuana. Gipson obtained the keys from Hemphill's girlfriend, who apparently also lived at the Wallace Street apartment. (*Id.* at 15-16.) However, he never asked her for consent to search the apartment. (*Id.* at 30.) When asked about consent at the suppression hearing, Gipson explained that he did not need consent once Hemphill admitted to living in the apartment. (*Id.*) Hemphill had already agreed, as a condition of his parole, that his supervising officer or any other person authorized by the Ohio Department of Rehabilitation and Correction could conduct a warrantless search of his residence at any time. (*Id*. at 19-20.)

Gipson searched the residence, but never found any marijuana. (*Id*. at 17.) He did, however, find a box of ammunition in a dresser drawer in the bedroom. (*Id*. at 18.) He also found Hemphill's paycheck stubs and men's and women's clothing in the same dresser. (*Id*. at 17.) After finding the ammunition, Gipson asked Hemphill where the gun was and Hemphill did not respond. (*Id.* at 18.) Gipson searched the bedroom for a weapon, and found a gun that

matched the ammunition between two mattresses. (*Id.*) Gipson then asked Hemphill who put the gun there and Hemphill admitted that he had placed the gun in the room and that it had belonged to his grandfather. (*Id*. at 18.)

While Gipson was searching the apartment, two detectives and two uniformed officers from the Hamilton Police Department were present. (*Id*. at 16.) Though they did not engage in the search, two of the officers questioned Hemphill about a temporary protection order violation. (*Id*. at 19.) It is unclear whether Hemphill made any statements at that time. After the gun was found, the Hamilton Police Officers "took [Hemphill] away." (*Id.* at 35.)

## II.     ANALYSIS

Hemphill moves to suppress all evidence seized during the search of the Wallace Street apartment and all unwarned statements that he made in response to official questioning. During the suppression hearing, Hemphill clarified that he does not challenge the search of the Long Street or Wallace Street apartment on Fourth Amendment grounds. Rather, he roots his challenge in the Fifth Amendment, arguing that Gipson failed to advise him of his rights prior to handcuffing and questioning him and that his statements were not made voluntarily. As a result, Hemphill argues, the Court should suppress all statements that he made in response to Gipson's questions and all physical evidence uncovered as a result of his statements, including the evidence found in the Wallace Street apartment. The Government responds that Gipson was under no duty to advise Hemphill of his rights because Hemphill was under supervision at the time and was required, as a condition of probation, to truthfully answer his probation officer's questions as to his probationary status. The Government further argues that Gipson's questioning of Hemphill at no time rose to the level of a custodial interrogation, such as would

necessitate a *Miranda* warning. In the alternative, the Government argues that even if Gipson violated the tenets of *Miranda*, his conduct does not justify exclusion of the physical evidence because Hemphill's statements were voluntary. Before the Court addresses the issue of voluntariness, the Court first determines whether, and if so when, there arose a duty to advise Hemphill of his rights during Gipson's interaction with him.

      A.     *Miranda* **Violation**

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. That prohibition "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). Ordinarily, the Fifth Amendment privilege is not self-executing. *Murphy*, 465 U.S. at 427. Therefore, if a person desires the protection of the privilege he must assert it or the privilege will be waived and his testimony will not be considered to be "compelled" within the meaning of the Fifth Amendment. *Id*.

There are, however, exceptions to that rule, one of which involves situations in which individuals are subjected to custodial interrogations without first being advised of their rights.[1] *Id*. at 429-30. In such cases, the Fifth Amendment is considered self-executing, and an

---

[1] Another exception applies where the government prevents a probationer from invoking his or her Fifth Amendment rights by threatening the probationer with sanctions. *See Murphy*, 465 U.S. at 434-38. Defendant does not argue that this exception applies in the instant case, focusing instead on the custodial interrogation exception.

individual need not invoke the privilege in order to seek suppression of his statements in a subsequent criminal prosecution. *Id*. Recognizing that the custodial setting "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," the Supreme Court has held that before an individual is subjected to custodial interrogation, that individual must be advised of his right to remain silent and of the consequences of his failure to assert that right. *Miranda v. Arizona*, 384 U.S. 436, 467-69 (1966); *see also Murphy*, 465 U.S. at 430. Where those individuals are not advised of their rights, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

A defendant does not lose the Fifth Amendment privilege against self-incrimination solely by reason of conviction of a crime, even if the defendant is incarcerated or on parole. *See Murphy*, 465 U.S. at 426. *Miranda*'s application is therefore similar in the probationary and non-probationary settings: the necessity of *Miranda* warnings turns on whether an individual is subjected to a custodial interrogation. *See Murphy*, 465 U.S. at 430 n. 5 (noting that, although the probation officer in *Murphy* was under no duty to advise the defendant of his rights prior to a non-custodial probation interview, "[a] different question would be presented if he had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting"); *United States v. Cain*, Criminal No. 08-26 (PJS/JSM), 2008 WL 2498176, at *12 n. 5 (D. Minn. May 21, 2008) (finding that, while *Miranda* warnings typically are not required for noncustodial probation meetings, there is no general exception to

6

the *Miranda* requirements where a parole, probation or supervised release officer is questioning a parolee, probationer or releasee in a custodial setting).

In the instant case, the Government does not appear to dispute that Hemphill was interrogated. The question is whether the interrogation was custodial or noncustodial. The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). In determining whether a suspect is in custody, a court must apply an objective standard to analyze "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *see also United States v. McNally*, 493 F. Supp. 2d 950, 957-58 (S.D. Ohio 2005). The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495).

Though the Sixth Circuit employs a totality of the circumstances approach to determine whether or not a suspect is in custody, the court has also outlined a number of other factors as particularly pertinent to that determination. *See United States v. Sivils*, 960 F.2d 587, 597 (6th Cir. 1992) (citing *United States v. Harris*, 611 F.2d 170, 172 (6th Cir. 1979)). The first factor the court tends to consider is whether a reasonable person in the defendant's position would feel free to leave. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). Beyond that, the Sixth Circuit has identified a number of other factors, including:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do

> so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*United States v. Salvo*, 133 F.3d 943, 950 (6th Cir.1998).

Several factors in that determination weigh heavily in favor of finding that Hemphill was in custody as of the point when Gipson handcuffed him. First, a reasonable individual serving a period of supervised release who has been handcuffed by his parole officer during an unscheduled visit likely would not feel that he was free to leave the situation. Hemphill did not enjoy unrestrained freedom of movement during the questioning. Rather, as discussed above, he was handcuffed and led around by Gipson. While being placed in handcuffs is not dispositive of the custody inquiry, particularly where officer safety is at issue, "[b]eing placed in handcuffs . . . is a restraint associated with formal arrest and is often a key in determining if a suspect is in custody." *United States v. Newton*, 181 F. Supp. 2d 157, 174-75 (E.D.N.Y. 2002). *See also United States v. Hinojosa*, 606 F.3d 875, 883-84 (6th Cir. 2010) (absence of handcuffs a factor in determining that the suspect was not in custody); *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) (suspect in custody when handcuffed and placed in the back of a police car, despite being told he was not under arrest). Though Gipson claims he only handcuffed Hemphill as a matter of policy, there is no evidence that he informed Hemphill of that. Nor is there any evidence that Gipson told Hemphill that he was not under arrest. Other factors that indicate that Hemphill was in custody include the fact that Gipson initiated contact with Hemphill and Gipson's purpose in questioning Hemphill was at least in part related to Gipson's suspicion that the pills found on the table in the Long Street apartment were illegal narcotics. Finally, four police officers, some of whom were wearing ski masks, were present during the questioning.

*See New York v. Quarles*, 467 U.S. 649, 655 (1984) (finding that the defendant was in custody for *Miranda* purposes where he was handcuffed and was surrounded by at least four police officers when the questioning at issue took place).

Other factors, such as the location and length of the questioning weigh somewhat in favor of concluding that Hemphill was not in custody. Gipson does not appear to have questioned Hemphill for a long period of time and the questioning took place in neutral locations, first in Hemphill's stated residence, then on a public street, and finally in Hemphill's actual residence. *See United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009) ("But all individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house."); *Salvo*, 133 F.3d at 950-51 (finding that location of questioning – dormitory computer room and parking lot of a fast food – was not inherently coercive). However, in light of all of the other factors, the length and location of questioning do not tip the scale in this case. *See United States v. Lewis*, No. 08-20028, 2008 WL 4849910, at *6 (W.D. Tenn. Nov. 6, 2008) (finding the defendant was subject to a custodial interrogation, despite the benign nature of the questioning, the non-coercive location, and the short length of the interaction, because the defendant had not initiated contact with the officer, was not informed that answering the officer's questions was voluntary, and was handcuffed and surrounded by several officers during the period of the questioning); *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir. 1993) (defendant in custody when handcuffed, told to sit in a specific place in the grass by the side of the road, not told whether he was under arrest, and was in the presence of several officers when questioned).

The Government argues that Gipson's purpose in questioning Hemphill about the gun was not coercive questioning about criminal activity, but rather was initiated to investigate a legitimate threat to safety. That factor, according to the Government, should sway the Court to conclude that Defendant was not in custody. The Government relies on two cases in which the Sixth Circuit, in analyzing whether defendants were in custody at the time officers questioned them about a weapon, found that questions about ownership of a weapon were not coercive in nature. *See United States v. Robinson*, 217 F. App'x. 503 (6th Cir. 2007); *United States v. Thomas*, No. 08-6471, 2010 WL 2294535 (6th Cir. June 7, 2010).

In *Robinson*, during a search of the defendant's residence, officers asked defendant if there were any weapons in the home and the defendant disclosed the location of multiple firearms. *Robinson*, 217 F. App'x. at 508. The defendant later argued that his admission should be suppressed because the officers did not *Mirandize* him prior to asking him about the weapons. The Sixth Circuit held that the defendant was not in custody at the time of the questioning because the defendant was not handcuffed, was questioned in his living room, and the questioning lasted less than ten minutes. *Id*. The court also found that the questioning not coercive in nature because the officers were merely trying to ascertain whether weapons were present in the house in order to protect officer safety. *Id*. at 508-509. The court noted that at the time of the questioning, "the officers did not know that defendant was a convicted felon, so the purpose of the questioning was limited to the officers' safety interest." *Id*. at 509. *Robinson* is easily distinguishable from the instant case. In the instant case, there are additional factors that lead the Court to conclude that Hemphill was in custody. Specifically, unlike the defendant in *Robinson*, Hemphill was handcuffed during the duration of the search and during the majority of

the questioning. Additionally, Gipson knew that Hemphill was a convicted felon and that possession of a firearm was specifically precluded by the conditions of his parole. Accordingly, *Robinson* does not persuade this Court to conclude that Hemphill's detention was not custodial in nature.[2]

The Court is similarly unmoved by *Thomas*, No. 08-6471, 2010 WL 2294535, a case in which the Sixth circuit found that an officer's single question about a weapon found during a *Terry* stop of a vehicle was merely investigatory in nature and did not suggest a custodial interrogation. *Id.* at *5. The circumstances surrounding the question about the gun in *Thomas*

---

[2] Hemphill also interprets the Government's reliance on *Robinson* to be an invocation of the public safety exception, which applies to a 'situation in which police officers ask questions reasonably prompted by a concern for public safety." *United States v. Kellogg*, 306 F. App'x. 916, 924 (6th Cir. 2009) (quoting *Quarles*, 467 U.S. at 655). To the extent the Government intended to raise this exception to the *Miranda* rule, the Court finds that it is inapplicable. For the public safety exception to apply, there must at minimum be sufficient evidence to show that the officer had cause to believe:

> (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to the weapon and inflict harm with it. The public safety exception is applied if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.

*Kellogg*, 306 F. App'x at 924 (quoting *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007)). The *Kellogg* Court did not apply the public safety exception in that case because the defendant was the only person in the home and he was handcuffed and unable to act. *Id.* Therefore, "there was no reason to believe that a weapon would be immediately accessible to individuals other than police." *Id.* For the purposes of the public safety exception, the instant case is materially indistinguishable from *Kellogg*. There is no evidence that anyone other than Hemphill, Gipson, and the four police officers were present in the Wallace Street apartment at the time that Gipson found the ammunition and questioned Hemphill about the weapon. Hemphill was handcuffed and therefore did not pose a threat. More importantly, even if the Court were to conclude that the public safety exception shielded Gipson's single question about the location of the weapon, the exception would not apply to Gipson's subsequent questions about ownership of the gun because by the time Gipson asked those questions he had already located the weapon and neutralized any potential threat.

are entirely different from the circumstances surrounding Hemphill's questioning. As discussed above, there are a number of factors that lead this Court to conclude that Hemphill was in custody at the time of questioning in this case. The fact that a particular question may be "investigatory" in nature does not somehow render that question exempt from *Miranda* protections where other factors indicate that under the totality of the circumstances the defendant was in custody at the time of the questioning.

Based on the totality of the circumstances in this case, the Court finds that Hemphill was in custody as of the point when Gipson handcuffed him. Accordingly, Gipson had a duty to advise Hemphill of his rights prior to any further questioning. All statements made by Hemphill in response to Gipson's unwarned questions during the time when Hemphill was in custody – including Hemphill's admission that he was staying at the Wallace Street apartment and his statement regarding ownership of the gun – are inadmissible in the Government's case-in-chief.[3] *See United States v. Sangineto-Miranda*, 859 F.2d 1501, 1515-16 (6th Cir. 1988) (discussing the *Miranda* exclusionary rule).

### B. Suppression of Evidence Discovered as a Result of Hemphill's Unwarned Statements

The Court next determines if the physical evidence discovered as a result of Hemphill's statements, particularly the gun found in the Wallace Street apartment, is similarly inadmissible. Gipson would not have been able to conduct a warrantless search of the Wallace Street apartment if Hemphill had not admitted that he actually lived in that apartment rather than the Long Street apartment. Therefore, while Hemphill does not directly challenge the search of the

---

[3] The Court reserves judgment as to the extent to which the suppressed statements may be admissible for impeachment purposes.

apartment, he argues that the physical evidence found during that search should be suppressed as "fruits of the poisonous tree." (Doc. 27 at 7.)

The fruit of the poisonous tree exclusionary doctrine that Hemphill relies upon comes from *Wong Sun v. United States*, 371 U.S. 471 (1963). In that case, the United States Supreme Court held that evidence and witnesses discovered both as a direct and indirect result of a search executed in violation of the Fourth Amendment must be excluded from evidence. *Id*. at 485-88. In *Michigan v. Tucker*, 417 U.S. 433, 445-46 (1974), the Supreme Court held that *Wong Sun* is inapplicable in cases involving mere departures from *Miranda*. In a subsequent case, *Elstad*, 470 U.S. at 305-308, the Supreme Court emphasized that the *Miranda* exclusionary rule "differs in significant respects" from the Fourth Amendment exclusionary rule because the *Miranda* rule is prophylactic and a violation of that rule does not always amount to a constitutional violation. A *Miranda* violation therefore does not automatically require the exclusion of the fruits of an unwarned statement. *Id*. As "long as the unwarned statement was voluntary under the Fifth Amendment," the fruits of the statement are admissible. *United States v. Crowder*, 62 F.3d 782, 786 (6th Cir.1995); *see also United States v. Patane*, 542 U.S. 630, 634 (2004); *United States v. Lewis*, 110 F. App'x. 569, 571 (6th Cir. 2004); *Sangineto-Miranda*, 859 F.2d at 1517.

When considering whether a statement was made voluntarily, the Court looks "at the totality of the circumstances to determine whether a defendant's will was overborne in a particular case." *United States v. Craft*, 495 F.3d 259, 263 (6th Cir. 2007) (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994)). "Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated

and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), *quoted in United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002). The Sixth Circuit "has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

Hemphill argues that in this case Gipson "consciously disregarded [Hemphill's] Fifth Amendment rights with the intent to build new felony charges against him" and that Gipson employed a "law enforcement strategy known as 'stalking horse' in which a parole officer assists criminal investigators . . . with the intent of bypassing constitutional rights." (Doc. 27 at 8 (citing *United States v. Penson*, 141 F. App'x. 406 (6th Cir. 2005)). Even assuming that the "stalking horse" theory discussed in *Penson* remains a cognizable argument,[4] that theory has no application in the instant case. In *Penson*, the Sixth Circuit defined the "stalking horse" theory to mean "that the police used the state parole officer as a means of carrying out a seizure which the police had no investigatory authority to perform." *Penson*, 141 F. App'x. at 410. There is no

---

[4] *See Penson*, 141 F. App'x. at 410 n.2 ("We note the question whether the 'stalking horse' theory is even a cognizable argument following the Supreme Court's decision in *United States v. Knights*, 534 U.S. 112 [](2001). In *Knights* the Court stated that in determining the constitutionality of a search of a probationer 'there is no basis for examining [the] official purpose' of the search. *Id.* at 122[]. As the Ninth Circuit noted in *United States v. Stokes*, 292 F.3d 964, 967 (9th Cir.), cert. denied, 537 U.S. 964[] (2002), this holding seems to suggest that prior 'cases holding searches of probationers invalid on the ground that they were subterfuges for criminal investigations is ... no longer good law.'")

evidence in this case that police officers directed Gipson to conduct any searches or question Hemphill. Nor is there any evidence to support Defendant's conjecture that Gipson intentionally violated Hemphill's *Miranda* rights in order to coerce Hemphill into disclosing information. Gipson testified that he did not advise Hemphill of his *Miranda* rights because he believed he had no duty to advise parolees of their rights. (Suppression Hearing Transcript 29.) While that testimony demonstrates a mistake of law on Gipson's part, it does not evince an intent to violate Hemphill's constitutional rights.

Hemphill is correct that there is some evidence of coercion in this case. Specifically, the fact that Gipson failed to warn Hemphill of his *Miranda* rights, that Hemphill was handcuffed, and that at least some of the officers present at the scene were wearing ski masks during the questioning suggests a somewhat coercive environment. *See Crowder*, 62 F.3d at 788 (noting that the failure to give *Miranda* warnings is an element of coercion). However, there is little to no evidence that Gipson's or any of the on-scene police officers' behavior was so coercive as to overbear Hemphill's will. The failure to provide a *Miranda* warning does not automatically render Hemphill's statements involuntary. *See Crowder*, 62 F.3d at 788. Similarly, the fact that Hemphill was handcuffed does not alone establish a level of coercion that would render a statement involuntary. *See, e.g., United States v. Sylvester*, 330 F. App'x. 545 (6th Cir. May 27, 2009) ( finding that the defendant's statements to Drug Enforcement Administration agents following his arrest were voluntary, even though they were made after defendant was kept handcuffed in a holding cell for five hours); *United States v. Cardenas,* 410 F.3d 287, 295 (5th Cir. 2005) ("Such basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression." (footnote with citations

15

omitted)); *United States v. Chen*, No. 07-20067, 2008 WL 659889 (E.D. Mich. Mar. 10, 2008) (noting that the presence of handcuffs alone does not establish coercion).

Even considering the combined effect of the handcuffs, the officers in ski masks and the absence of *Miranda* warnings, when viewed in the totality of the circumstances, those factors do not indicate a level of objectively coercive behavior such as would render Hemphill's statements involuntary. As discussed above, Gipson's questioning did not extend over a prolonged period of time. There is no evidence that Hemphill was physically punished or denied food, sleep, or any other basic need. Nor is there any evidence that Gipson or any law enforcement officer threatened Hemphill in any way or used any psychological tactics to coerce Hemphill to talk. Hemphill was an adult at the time of the questioning and was not a stranger to the criminal justice system. Rather, the entire interaction between Hemphill and Gipson appears to have lasted only a short period of time and to have been relatively civil in nature. The Court therefore finds that Hemphill acted voluntarily when responding to Gipson's questions. *See United States v. Flack*, No. 3:08-CR-108, 2009 WL 5031320 (E.D. Tenn. Dec. 11, 2009) (finding that the defendant's unwarned statements were voluntary, despite the fact that he was handcuffed and interrogated for forty minutes, where the defendant had previously been convicted of many offenses, was not deprived of food or sleep, and was not physically abused or threatened with physical violence). Accordingly, there is no basis to suppress the physical evidence uncovered during the search of the Long Street and Wallace Street apartments.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Suppress Evidence. (Doc. 18.)  The Court hereby suppresses all statements made by Hemphill in response to an unwarned custodial interrogation that occurred on February 4, 2010.

IT IS SO ORDERED.

                                                                  ___s/Susan J. Dlott_____
                                                                  Chief Judge Susan J. Dlott
                                                                  United States District Court